Upon review of the competent evidence of record, and finding no good grounds to receive further evidence or rehear the parties or their representatives, the Full Commission upon reconsideration of the evidence, affirms the Opinion and Award of the deputy commissioner, with some modifications.
The Full Commission finds as fact and concludes as matter of law the following which were entered into by the parties in a Pre-Trial Agreement at the hearing and in a Supplemental Stipulation dated 18 December 1998 as:
 STIPULATIONS
1. On the date of plaintiffs alleged injury, the parties were subject to and bound by the provisions of the North Carolina Workers Compensation Act.
2. On that date, an employment relationship existed between plaintiff and defendant-employer.
3. Plaintiffs average weekly wage was $459.44.
4. Defendants paid plaintiff workers compensation for this claim from 16 June 1995 through 29 June 1995.
5. Plaintiff sustained two prior compensable injuries while employed by defendant-employer. The first claim, I.C. No. 261491, was for an injury occurring on 28 July 1992. The second claim, I.C. No. 411319, was for an injury occurring on 10 January 1994.
6. A set of documents attached to the parties Pre-Trial Agreement and identified as Joint Exhibits 1-5 and E1-E4 is admitted into evidence.
7. A set of plaintiffs medical records from Duke University Medical Center, identified as Joint Exhibit J, is admitted into evidence.
 * * * * * * * * * * *
Based upon all of the competent evidence of record, the Full Commission makes the following additional:
 FINDINGS OF FACT
1. At the time of the hearing before the deputy commissioner, plaintiff was sixty-three years old. Plaintiff worked part-time for defendant-employer as a credit manager.
2. Plaintiffs employment history included twenty-one years of service in the United States Air Force, during which time he attained the rank of major. Prior to plaintiffs employment with defendant-employer, he owned and was captain of a charter fishing boat. Plaintiff had also worked as an insurance adjuster and as a branch manager for a commercial tile business.
3. As of the date of the hearing before the deputy commissioner, plaintiff had been employed by defendant-employer for approximately eight years. Defendant-employer operated a retail furniture business. During that time, defendant-employer employed plaintiff as an office manager and assistant credit manager. Plaintiffs duties included negotiating sales contracts with defendant-employers customers, conducting computerized investigation of customers credit histories, preparation of advertisement mailings, making telephonic and written contact with customers regarding past due accounts, and general office tasks such as filing, answering telephones, and serving customers.
4. Plaintiff has had severe osteoporosis since 1992. Osteoporosis is a disease that causes bone tissue loss. As bone tissue is lost, the micro-architecture of the bone is destroyed, making the bone susceptible to fracture with little or no trauma. With osteoporosis, vertebral fractures are generally the earliest and most common fractures that occur. Such fractures may worsen, especially where the individual has "impact. Persons with osteoporosis experience chronic pain, which is among the most difficult symptoms to treat in these patients. After two or three compression fractures, it is virtually impossible to eliminate the chronic pain, described by some osteoporosis patients as spasms, an ache or fatigue. Prior to 30 May 1995, plaintiff had sustained numerous compression fractures, including fractures from T6 through T11 and at L2. Bone loss due to osteoporosis may be progressive. Plaintiff continued to sustain bone loss due to osteoporosis through 17 June 1998.
5. During his employment with defendant-employer, plaintiff sustained two injuries for which he received workers compensation. The first injury occurred in 1992. As a result of that injury, plaintiff sustained a fifteen percent permanent impairment of his back. The second injury occurred on 10 January 1994. As a result of his second injury, he sustained an additional permanent impairment of his back of eight and one-half percent. Plaintiffs claims for these injuries were resolved by compromise settlement agreements, duly approved by the North Carolina Industrial Commission.
6. Christine D. Harper, M.D., a specialist in endocrinology and metabolism, began treating plaintiffs osteoporosis in March 1994. By that time, plaintiff had been involved in three incidents that caused vertebral compression fractures. Plaintiff was experiencing incontinence. Unable to determine the cause of plaintiffs incontinence, Dr. Harper referred plaintiff to William Richardson, M.D., an orthopedist for a second opinion. Dr. Richardson evaluated plaintiff on 16 June 1994. Dr. Richardson was unable to determine the cause of plaintiffs incontinence, but recommended that his future employment be restricted to sedentary work. Due to the severity of plaintiffs condition, he should not have lifted more than ten pounds, lifted over shoulder height, or performed forward bending. Plaintiffs employment with defendant-employer was consistent with the restrictions imposed by Dr. Harper and Dr. Richardson. Plaintiff returned to work for defendant-employer and continued working through 30 May 1995.
7. On 30 May 1995, plaintiff was responsible for closing the store and securing the building at the close of business. In connection with closing the store, plaintiff lifted a tub containing ledgers and placed it in the top drawer of a file cabinet. The tub weighed approximately fifteen pounds.
8. After storing the ledger tub, plaintiff undertook to close and lock the stores security gate. The metal gate, which weighed approximately forty pounds, sagged approximately six inches and had to be lifted before it could be locked. While lifting the security gate, plaintiff felt a crushing sensation and a sharp pain in his back. Plaintiff continued to experience pain in his back following this incident.
9. When plaintiff returned to work two days later, he reported to his supervisor, Mark Underwood, that he had injured his back while closing the store on 30 May 1995. Mr. Underwood understood at that point that plaintiff was experiencing increased symptoms from a prior injury, but, by 16 June 1995, Mr. Underwood realized that plaintiff was describing a new injury to his back. Mr. Underwood communicated plaintiffs alleged 30 May 1995 back injury to defendant-insurer on 19 June 1995.
10. Defendants received actual notice of plaintiffs claim on 16 June 1995.
11. During the first week after 30 May 1995, plaintiff experienced back pain, but he was able to perform his regular duties after taking medication to relieve the pain. After the first week of June 1995, plaintiff began experiencing muscle spasms in his back and he sought medical treatment from Stephen P. Montgomery, M.D.
12. When examined by Dr. Montgomery, plaintiff had no paraspinal spasm. Neurologically, plaintiff had no abnormality. X-rays revealed plaintiffs significant osteoporosis and his prior compression fractures. Dr. Montgomery diagnosed a lumbosacral strain and prescribed a back brace. On 9 June 1995, Dr. Montgomery received prior x-ray films from Duke University Medical Center. Dr. Montgomery compared those films to plaintiffs most recent x-rays. The comparison did not reveal any changes in the condition of plaintiffs spine, and no acute fracture.
13. When plaintiff returned to Dr. Montgomery on 15 June 1995, he had spasms, tightness in the lumbosacral region, and limited motion in all planes. Neurologically, plaintiff had no abnormality. Dr. Montgomery referred plaintiff to ProActive Therapy and excused him from work.
14. Plaintiff next presented to Dr. Montgomery on 22 June 1995. On examination, plaintiff had moderately limited range of motion and generalized tenderness. Dr. Montgomery released plaintiff to return to work part-time within a period of several days.
15. Plaintiff presented to Dr. Montgomery on 6 July 1995. On that date, plaintiffs pain was moderate, and he was taking pain medication once per day. Plaintiff continued to wear his back brace. Dr. Montgomery noted that plaintiff "certainly can work.
16. Plaintiff was unable to return to work, due to his back pain, from 16 June 1995 through 22 June 1995. On 23 June 1995, plaintiff began working part-time, gradually increasing his hours until 7 July 1995, when he resumed full-time work. Plaintiffs capacity to earn wages was reduced during this time by $365.44. Defendants paid plaintiff disability compensation from 16 June 1995 through 29 June 1995. From 7 July 1995 through December 1995, plaintiff earned and was capable of earning wages equal to or greater than the wages he earned prior to 30 May 1995.
17. On 27 September 1995, plaintiff returned to Dr. Harper for the first time since 11 August 1994. Plaintiff presented to Dr. Harper on that date for re-evaluation of his osteoporosis. At that time, plaintiffs height had decreased by three centimeters since 9 March 1994. Plaintiff also had increased spinal angulation, increased kyphosis, and a changed posture. However, on deep palpation, plaintiff did not have pain. This absence of pain suggested to Dr. Harper that plaintiff did not have an acute fracture.
18. On 4 January 1996, Dr. Harper reviewed plaintiffs x-rays from 1994 and June 1995. The x-rays from June 1995 were of such poor quality that Dr. Harper ordered new x-rays that were taken on 27 December 1995. Based upon Dr. Harpers comparison of the 1994 x-rays and the December 1995 x-rays, she determined that plaintiff had an increase of his kyphotic deformity and previous fractures at T9 and T8, but no others. Plaintiff first informed Dr. Harper of the 30 May 1995 incident on 4 January 1996.
19. After plaintiff returned to the care of Dr. Harper in 1995, she did not alter the work restrictions she had imposed following his injury on 10 January 1994. Dr. Harper continued to restrict plaintiff from lifting greater than 10 pounds, lifting above shoulder height, forward bending, and sitting for extended periods of time.
20. From 7 July 1995 through 27 December 1995, plaintiff continued to work full-time under the restrictions imposed by Dr. Harper. During this period, plaintiff regularly worked in excess of forty hours per week. From 29 December 1995 through 4 January 1996, plaintiff took vacation leave. Plaintiff did not work from 5 January 1996 through 16 February 1996. Plaintiff did apply for social security disability benefits in January 1996. After learning that these benefits were taxable, plaintiff returned to work for defendant-employer in February 1996.
21. Dr. Harper never recommended that plaintiff cease working full-time. None of the physicians excused plaintiff from full-time work when he ceased full-time work in December 1995. From 7 July 1995 through 27 December 1995, plaintiff experienced back pain. However, plaintiff was able to relieve his pain by taking the pain medication Lorcet. Taking two Lorcet tablets per day did not constitute over-utilization of pain medication. Plaintiff was also able to alleviate his pain by alternating between sitting positions. The duties of his position with defendant-employer permitted plaintiff to alternate between sitting and standing positions as necessary to alleviate pain.
22. From 16 February 1996 through 18 June 1998, plaintiff worked 110 weeks. During these 110 weeks, plaintiff worked an average of 13.17 hours per week. Plaintiff worked as many as thirty-six hours in one week. Since February 1996, plaintiffs duties included answering the telephone, maintaining mailing lists, addressing cards, talking to customers regarding contracts, performing credit checks, and negotiating contracts. Plaintiffs duties since February 1996 are substantially the same as the duties he performed prior to that date. The duties performed by plaintiff since February 1996 are essential to the operation of defendant-employers business. Plaintiff continued to work in this capacity through the date of the hearing before the deputy commissioner.
23. As a result of the incident on 30 May 1995, plaintiff sustained an increase of the preexisting compression fracture at T9. This injury rendered plaintiff incapable of earning wages from any employer on 16 June 1995 through 22 June 1995. As a result of plaintiffs injury, his capacity to earn wages was reduced from 23 June 1995 through 6 July 1995. Beginning 7 July 1995, plaintiff regained his previous earning capacity. Plaintiff maintained his previous earning capacity through the date of the hearing before the deputy commissioner. Plaintiffs actual earnings after 27 December 1995 were less than the wages he was capable of earning. The difference between plaintiffs actual earnings and his earning capacity resulted from his discontinuation of full-time employment with defendant-employer. When plaintiff discontinued his full-time employment, he remained capable of earning wages equal to or greater than the wages he earned before the injury on 30 May 1995.
 * * * * * * * * * * *
Based on the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. On 30 May 1995, plaintiff sustained an injury by accident arising out of and in the course of his employment with defendant-employer. G.S. 97-2(6).
2. As a result of his injury on 30 May 1995, plaintiff is entitled to payment of compensation for temporary total disability at the rate of $243.63 per week from 16 June 1995 through 23 June 1995, and is entitled to payment of compensation for temporary partial disability in the amount of $365.44 from 24 June 1995 through 6 July 1995. These amounts are subject to an offset for $400.00 which defendants have already paid plaintiff. G.S. 97-28, 97-29, 97-30.
3. If plaintiff sustained any permanent impairment as a result of his injury on 30 May 1995, he is entitled to payment of permanent partial disability compensation for the appropriate rating. G.S. 97-31(23).
4. Plaintiff is entitled to payment of all medical expenses incurred as a result of his increased T9 compression fracture. G.S. 97-25, 97-25.1.
 * * * * * * * * * * *
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendants shall pay plaintiff compensation for temporary total disability at the rate of $243.63 per week from 16 June 1995 through 23 June 1995.
2. Defendants shall pay plaintiff $365.44 as compensation for temporary partial disability 24 June 1995 through 6 July 1995.
3. The amounts due plaintiff under paragraphs 1 and 2 of this Award shall be paid directly to plaintiff in a lump sum, after deducting a $400.00 offset to defendants, and subject to the attorneys fee approved in paragraph 5 below.
4. Defendants shall pay all medical expenses incurred as a result of plaintiffs increased compression fracture at T9.
5. A reasonable attorneys fee of 25% of the compensation due plaintiff shall be deducted and paid directly to plaintiffs counsel.
6. Defendants shall pay the costs, including an expert witness fee of $350.00 to Dr. Harper, if this amount has not already been paid.
 S/ _______________________ RENÉE C. RIGGSBEE COMMISSIONER
CONCURRING:
S/ ____________________ THOMAS J. BOLCH COMMISSIONER